Good morning. Welcome to everyone. Our first case on the call of the docket today, Wednesday, September 19, 2012, is agenda number 18. Case number 113569, Roger Toftoy, et al., Eppelees v. Ken Rosenwinkel Appellants. Counsel for the appellant, please proceed. Toftoy, right? Rosenwinkel. No, no, I mean the name. Yeah, I know. Toftoy and Rosenwinkel. Yeah, I get that right. Mr. Chief Justice, fellow members of the court, counsel, may it please the court, my name is Neil McKnight, and together I'm here today with Mr. Kevin Butler, and we represent Mr. Ken Rosenwinkel and the Rosenwinkel family partnerships. This case involves the interpretation and application of the Farm Nuisance Act, and whether it can be applied as written, or whether there is a need to apply an interpretation or limitation into the act in order to affect its intended purpose. The policy represented in the language of the act is to protect Illinois farmland and farmers from nuisance lawsuits that may discourage capital development of farmland, and to further protect farmland from these type of suits and protect the farming industry. Does this hinge, counsel, on how broadly we interpret the statute? Absolutely. Broad interpretation you win, narrow interpretation they win? I think under either circumstance that the Rosenwinkels should prevail, but I believe under the broader interpretation that's the appropriate interpretation as was intended by the legislature. The act specifically provides that no farm shall become a nuisance because of any change conditions in the surrounding area occurring after the farm has been in operation for more than a year, and the farm was not a nuisance when it began operation. And under the circumstances, the language of the statute goes back to the 70s and 80s and has been adopted by states around the country, and that was in part in an effort to address nuisance suits that were brought against farms. But the first language, or the first statute or state that used this language was Alabama. And in Alabama, they adopted it with regard to industrial operations. And as early as 1942 in Beam versus Birmingham slag, the Alabama Supreme Court recognized that the effect of the language in this type of statute with regard to the any change conditions language was to relieve industrial operations and later Alabama adopted it with regard to farming operations, having to anticipate changes in conditions in the surrounding area which would render the operations a nuisance beyond 12 months after the operation began. And so the original interpretation of the act is just that, so that people who are doing these type of operations and they've been in existence for a year don't have to think about what the potential possibilities of use of land are, for example, across the street and down the street. And under the circumstances, that is the way the act should be interpreted. And it's our position that if you interpret it as the lower court interpreted, which is to require some kind of anticipatory presumption or idea of how someone potentially might use the land in the future, that defeats the whole purpose of the act because that is going to cause situations where farmers may decide not to farm anymore. Farmers may refrain from making capital investments into their operations. And under those circumstances, that's exactly opposite of what the legislature intended by enacting this piece of legislation. Is there a difference here because there was an existing residence, albeit it was vacant at the time the farming operation started? Could that not be classified as a nuisance to that residence or to the resumed use of that residence? No, because under the circumstances, the legally protected interest that existed at the time was with Clarence Toftoy, who was the father. And Clarence Toftoy's legally protected interest in the property was at that point, when this property was used as a cattle farm, was to use it as row crops and then to rent the house out as a tenant residence. He never lived there. And then ultimately he abandoned that and the person that had lived in the farmhouse stopped living there. And then three months after the last date of residency, the Rosenwinkel family cattle operation began. And it began in operation for more than almost ten years. It began in March of 1992, continued through every year until 1997. And then in 1997, Mr. Toftoy not only had never stopped renting the house across the street, but he demolished the home. And at that point, there is no legally protected use, even in some kind of expectancy that he might use the residence to rent. And he certainly didn't use it as his own residence. He then transferred ownership of the property, and he only transferred 1.83 acres of the property, to his son and daughter-in-law. And that was for the development and creation of a residential home and a residential lot. And it's a 1.83 acre lot that was separated out from the rest of the farm parcel that had been there before. So under the circumstances and based upon the plain language of the statute, the Rosenwinkel's operation had been in place for more than a year. And that, and not until long after the operation was in place, did a new owner in the form of Roger and Bobby Toftoy come to the courts and ask that the Rosenwinkel's operation be enjoined from specific activities that were set forth in the trial court. And under those circumstances, merely because there was a residence in the past, that doesn't give rise to a legally protected interest. Otherwise, we'll be in a situation, for example, where nearly every parcel of land in the state may have had a homestead on it at one point or another. And so what that would result is a trial court doing a historical analysis of what was going on on that piece of property, which would then completely undermine the purpose of the Farm Nuisance Suit Act and the intended purpose of the act, which was to, what I will say, preserve farmland. Is the change condition here, counsel, the change in ownership or the change in the form of the demolishing and building of a new house, or both? I think it's both. I think it's a change in ownership. I think it's a change, it's the demolition of the house. There's also a change in the construction of a new house. There's also a change in the use of the property itself, in that previously in the 10 years prior or 12 years prior, there had been no residential occupancy on that parcel of land, and only after 2004 was there ever any kind of residential occupancy on the land itself. So under the circumstances and based upon this plain language which says any change, there are a myriad of changes that have occurred. One, ownership. Two, occupancy. Three, the character of the land in the sense that a new structure has been demolished and an old structure has been demolished and a new structure has been built, and then ultimately there's the actual subdivision of the land itself. And I would point out to the court that the Rosenwinkels operation sits in a zone as agriculture. The property across the street as a 1.83 acre parcel is a non-conforming use in that zone. And under the circumstances, what's happened now is someone who comes in and says, I have a non-conforming residential use of this property, is now going to impose that non-conforming use on a conforming use in this zone. And under the circumstances, that's exactly opposite, again, of what the legislature intended by the act. Would it make any difference if the old farmhouse had just been remodeled instead of torn down? I think it would make a difference if the old house had been remodeled. I don't think it makes a difference at all because there hasn't been occupancy under those circumstances. Again, it has to be a legally protected interest and an invasion and an actual use. And there was no actual use of the property for the one year preceding or during the time which the Rosenwinkels began their farm operation. And, in fact, the time there is 12 months or 12 years, excuse me, that the property had been used without complaint. And so under the circumstances, if we look at the factors that one has to look at under the statute, and I think you look at that as one, was it a nuisance previously? And there's no evidence that it was a nuisance previously. There's no lawsuits. There's no allegations of violations of statutes. There's no allegations that there's been violations of regulations. So it wasn't a nuisance previously. And then the next question is, was it an operation for more than a year? It was an operation for more than a year. And then the next issue is, what are the change conditions? And I think that's where the lower courts ran afoul of the language of the statute is, what are the change conditions? And the change conditions are apparent based upon the subdivision, occupancy, construction, that type of thing. And then this concept of somehow having to look at a historical use of the land, again, runs contrary to those concepts of protecting farmland. Because, again, you can contemplate a situation where, obviously, there's been a historical use of the land and they say, for example, it laid fallow and not used, and then it springs into existence again because somebody decides to move back into a piece of property. And finally, there's been some discussion about whether or not this constitutes an agricultural or non-agricultural use. It's our position that the statute applies regardless. It was broadly interpreted. It was broadly drafted. It says any. The legislative history on it says if you move into the countryside, there's no discussion of what a non-agricultural use is versus an agricultural use. And under either circumstance, in the case at bar, what is complained of here are residential, non-agricultural uses. There is some discussion in the Toftoy's presentation to the court and their brief to the court that somehow they should be considered as a farmer and this is a farm versus farm situation. That's not the case. The evidence that was submitted at the court, the complaint that was filed, as well as the circumstances around the claimed nuisance, all involved residential, non-agricultural activities on the 1.83 acre plot of land that was not zoned farmland but was solely used for residential purposes. So under the circumstances, that sort of what I will call exemption doesn't apply. And in the trial court, the plaintiffs themselves acknowledge that their property was not a farm. They acknowledge that. Later on, they added a parcel but those parcels weren't brought together. So under the circumstances, again, we have a situation where the act should be broadly interpreted and this isn't what I will call an ag versus ag question. And even if the court were to say somehow this is limited to non-agricultural activities, in the case of Barr, these are exactly what was complained of, non-agricultural activities. Just out of curiosity, the plaintiffs allege that the cattle operation could be modified to do away with excessive flies. Was that ever discussed, brought up in papers, testimony anywhere in the record in this? Well, there was an expert that was tendered with respect to what potentially could be done to reduce fly populations on the property. Although the expert in the trial court was specifically prohibited from testifying with regard to whether or not there were proper, improper, or negligence issues in the action because he was unable to opine on that and he specifically testified both at trial and in discovery that he had no position or opinion on those issues. So under the circumstances, the concept is that you can't force a farmer under these circumstances to do that analysis because, again, what we'll have a situation is that farmers are in operation for more than a year and then people will come in and say, I'm going to add costs to what you're doing. And I'm going to say you could do it in a different way, maybe even a more comprehensive way, but it's not necessarily a better way and it's certainly not required under the law, either common or statutory provisions of the law. And so if they were faced with a situation where an expert is able to come in and say, I think you could modify your operations to do something different, we're again faced with that concept where a farmer is in fear of a nuisance lawsuit being brought and then he's in fear of having to make changes to his operations which are wholly legal and wholly appropriate simply based upon the subjective nuisance complaints of a person that lives nearby. So to the extent that there was testimony there, that testimony isn't relevant to the analysis presented to the court. So the next issue I think that needs to be addressed again is the concept that somehow that there is a, that these people will hear first before the Rosenwinkels, meaning that the Toftoys arrived before the Rosenwinkels had their farm in operation. And I think if you look at the facts of the case and based upon the express written materials that are put before the court and put before the trial court, there's no doubt that the transfer of ownership on the property itself doesn't occur until six years after the operation begins. There's discussion about what I will call a succession plan, but no such succession plan was ever provided to the trial court. And the only issues that are raised with regard to that issue are what I will call discussions that perhaps may have been had between various family members, but under those circumstances that doesn't constitute a succession plan. And under those circumstances that could create situations where people retroactively say, I'm going to allow an oral succession plan to establish my ownership in a piece of property and therefore I'm first in time. And again, that runs into the statute of frauds issues that were presented in the trial court. And there is no succession plan. And under the circumstances, there's absolutely an expressed, what I will say, change in ownership that's recorded with the Kendall County recorder of deeds. There's a change in use and there's a construction of a new home. And with that, I think I'll reserve my comments for rebuttal. And I would just ask that the court, I think that under the circumstances, the matter should be remanded to the trial court for the application of the Farm Nuisance Suit Act and for assessment of statutory fees and costs under the act. Thank you. Thank you, Mr. McKnight. Counsel for the appellee. Good morning, Chief Justice, members of the court, opposing counsel, and the audience present today. My name is Fred Roth and I represent the plaintiffs, Bobby, Roger Toftoy, individually and as parents of their two children, Natalie and Haley Toftoy. This action was brought as a nuisance action. Both sides had asked for a jury trial. After the motion for summary judgment was denied and after motions and limine were heard, both sides waived their right to the jury trial and we had a bench trial. Judge Abramson listened to the evidence and then she took it under advisement and about a month later issued about a half hour ruling from the bench, which is part of the record. She found that very specifically after listening to all the evidence, all the testimony, and looking at all the exhibits, that there is a house where there was a house. There is now a family where there once was a family. This farmhouse had been there, the original farmhouse, for over 100 years on this property. It had a tenant in it who was there when the Rosenwinkels bought the property across the street. This case does not threaten Illinois agriculture. It doesn't threaten the livestock industry. It doesn't threaten them with any number of lawsuits over nuisance because of how farmers conduct their business. It doesn't threaten them with higher costs. It's a very simple story. The story is the Toftoys, Clarence Toftoy, Roger's father, bought the farm in 1967. Roger farmed with his father on that farm every year from 1967. In 1989, Bobbie Toftoy raised her horses there, boarded her horses at that location. When the tenant left in 1991, as Bobbie Toftoy and her husband have testified, it was their plan to move into the house and take it over. Yes, there is no written succession plan. In fact, coming from a farm family myself, it's hard to get my own parents to put together a succession plan. There was no written succession plan. But as Bobbie Toftoy testified, they looked into remodeling the existing old farmhouse and decided it was too expensive, and so they would do something different. They would tear it down and build on the very location, the very same footprint, a new house. For those of us from the farming community, we know things don't move at the same pace as they do for some major developer that builds a house in four or five months. The Toftoys' family started in that same time period, Natalie and Haley Toftoy. Mr. Roth, if they had lived, you said it was 100 years ago, right? The house was built over 100 years ago. Let's say they lived in that house for 100 years, and then for 100 years, they lived there one year and did nothing for 100 years. I mean, would that be a change condition? If the Toftoys had lived there for one year? One year, farmed the land, leveled it 12 years after the cattle operation, would that be a change condition? No. It wouldn't be a change condition because it was always intended as a residence when it was there, and when they decided to take over that residence from Clarence Toftoy, they were going to remodel it and keep it as a residence. They decided it was going to cost too much to remodel it, so they decided to tear it down. You're not at my hypothetical anymore, right? I think I'm missing it. Yeah, well, I'm just saying they were there for 100 years ago, and they had a farmhouse, and they lived there. Okay. If they only lived in that farmhouse for one year. Okay. It's a hypothetical now. Okay, it's a hypothetical. Right. If they only lived there and farmed it and lived in the house for a year. Right. Right. And then didn't do anything for 99 years. And in that period of time, a cattle operation started up, and for 12 years that cattle operation was in existence, and then they decided to build a house. One of the Toftoys who still owned the land decided to build a house at that point. Would that be a change condition? Not if it was being built in the very same location, just replacing the existing house. It wouldn't be a change condition, because what has not been talked about in this change condition, and Justice Jorgenson got it right, is she said there has to be a direct causal relationship between the change, whatever the change condition that's being alleged to have occurred, and the nuisance. Going from one house that's roughly 3,000 square feet to a new house that's roughly 3,000 square feet at the very same location is not a change in the condition that caused there now to be a nuisance. And the condition is only then the use of the property, the fact that there was a house there and now there's a house there, and not whether or not people lived there. Correct. If we want to say that occupancy alone is a change condition, then I guess everyone needs to worry about if they lose a tenant, or if somebody moves out briefly, or somebody dies, or somebody goes bankrupt, whatever happens, that these issues of occupancy are not a change condition with regard to the use of the house. The house was used as a house. The new house is used as a house. It's still being used as a house. It is a, you know, this argument that it's a non-conforming versus conforming use may or may not have some validity in some zoning law somewhere in Kendall County, but it doesn't have anything to do with the fact that it's used for a single family. Now, if they had brought in a bed and breakfast and started a commercial business and it was still the same house but they had a different use, then I would call that a change condition. I think Judge Abramson in the trial court even mentioned that in some of her comments, that, you know, there's been no change here. It's a single family home before. It's a single family home now. The use hasn't changed. They're not starting a business there. They're not arguing that because now we have people showing up as a beauty parlor or something in the country that now the nuisance is affecting the business or something. This is not the case. So your definition of the word condition is use. My definition of the word condition is that something changed in the usage that made what otherwise was not a nuisance from the nearby operation to become a nuisance. That's the language where it says the nuisance must be, quote, because of any change conditions in the surrounding area. So there has to be this causal connection. So does the change in the title or the subdivision of the property, does that factor in in any way? You say it could factor in, but in this instance, absolutely not. Why not? Because whether Clarence owned it or Bobby and Roger owned it by gift, which is how they received it, it's still being used. The use hasn't changed. It's still going to be a single-family residence. If it had been sold to a developer and subdivided into three lots and three houses built, the use would have been changed. What about if they owned that land and they farmed it? But they intended that at some point they were going to build a house on the property, and then they built the house. Is that a change condition? If there had been no house there and they bought 100 acres and then they put the house there, I would call that a change in condition because they're going from an agricultural use of the land in the pure sense, raising crops, for example, and they carve out, say, five acres and put in a homestead with a single-family home, I would call that a change. When do you measure change from? The question is when do I measure the change condition? Do you measure the change condition in this case from the father's ownership of the land with the house on it? Do you measure it from the son's acquiring title to it? Do you measure whether the change occurred from the time the Rosenwinkels began their farming operation? So give me an idea how we would structure this. I would not structure it based on the historical use as much as I would look at when did the operation of the Rosenwinkels begin. And from the time the Rosenwinkels began their operation, was there a subsequent change of use from a single-family home to some other use from that point in time if I look at the statute? Because it's trying to determine the time I'm claiming nuisance, did the nuisance occur because of a change condition in the surrounding area? And so it's not this... If the house was vacant, it would make no difference. It would not make difference to me under this statute because, as Justice Jorgensen implied, when they bought the property across the road, they knew a house was there, they knew someone was living there, and as time went forward, it was intended and always stayed as a single-family house, both in intention and in use. It never changed from that. There was a change made as far as tearing down the old structure and putting up a new structure, but the intention was as a single-family house to be used as a single-family house. What's the significance of the word any in the statute? Well, they're not trying to say that... I want to go to the Sousa case because I think it answers your question best. In the California Sousa case, two farmers right next to each other, they're both raising rice, and one part of raising rice is flooding the fields. And because they were both flooding the fields, the fact that the water went across their dividing line, it didn't matter to anyone because they both had extra water. Then one of the farmers said, I'm going to change to row crops, not rice anymore. The farmer who was doing the rice continued to flood. His flood now of his field that went across the dividing line and put water into the row crops, the farmer with the row crops sued him and said, you're causing a nuisance to my row crop operation. And the California court said, no, you, Mr. Row Crop Farmer, have changed your use. The row crop farmer's argument was, it's still agriculture, I'm still raising crops, there's no change in use. And the court said, no, there was a change in use because you both used it as rice and rice floods. My point here is, this house, both before Rosenwickles came in and after they came in, the use intended and how it was used was always as a single family home. They didn't change it from being a single family home to something else. You commented, counsel, that when we were going through the definitions, that it would be, the condition would be a condition that, and I might not use your words exactly because it's been some time now, the condition relegated the fact that it was now a nuisance. Do you remember talking something about that? When I said, did you define, do you define condition as use? Do you recall that? Yes. I was, for purposes of this case, I'm defining condition as use. There may be some other kind of condition that I can't think of that's beyond use. I can't think of one at the moment. And a change of condition, I think you said, would be something that would mandate that it is now a nuisance. Well, there has to be a causal connection between what the change is. Right. Okay. And what I'm having trouble with is the whole occupancy idea. Because tell me if my facts are wrong. After 1991, the house was vacant until it was demolished in 97, right? Correct. And the cattle operation came in in 92. Correct. So when they came in, that house was vacant. They didn't come in to, you mentioned a couple of times that it's, you know, he was living in the house. He wasn't living in the house when they came in to the picture, was he? When they purchased the farm across the road, there was an individual, the name was Slatton, that was living in the house as a tenant in the house for a family in 1991. That's when they bought the property across the road. So when they made their purchase of the farm across the road, there was someone living in the house. But in March of 92, they began using it as a cattle operation. Correct. So in March of 92, there was no one in the house. Right. And they had 10 cows, I think. So I guess my specific question is, then, why wouldn't the change in condition be that there is no nuisance? Is there if no one's living in the house? I mean, the flies are a nuisance to the people. They're not a nuisance to the house, are they? Well, arguably, there could be a situation that there's a nuisance even when no one's living in the house. For example, Bobbie Toftoy boarded her horses starting in 1989 and continuously boarded her horses right next to the house and the barn throughout 1989 all the way to the present day. Conceivably, if she and the horses were bothered by flies back in 1992 when they started the cattle operation, conceivably, she might have had a claim for nuisance because she was boarding horses there and both the horses and she were affected by the flies. But none were brought until there were people living in the house. Correct. Correct. The fly problem existed to such an extent in 2007. The question is, why doesn't the nuisance attach somewhat to the occupancy here, and occupancy, therefore, is the condition that has changed? I think we, because that's a very slippery slope, if you had a strip mall sitting there and because of the Great Recession, everybody bailed out and it went into bankruptcy and it's vacant for two or three years before they can get someone in there and a cattle operation moves next door, we're going to say, okay, you cannot use it anymore as a strip center because of the flies and because of the time that they moved the cattle operation next door to this empty strip center, there was nobody there, which there was a reason for that because of the economics, that would be the problem. If this house was in great condition when the Slattons moved out and the Toftoys intended to move in after she moved out, they would have moved in in 1992, but it was in dilapidated condition and they spent time trying to figure out what to do with it. They actually tore it down in 1997. Let me follow up on Justice Thomas' first hypothetical. As we all know, or at least those of us who grew up in farming communities, the family farms of 160 to 400 acres are gone right away and they're larger. And in my own community, probably half a dozen farmsteads were initially rented out to people who weren't farming and ultimately torn down. So if 99 years later somebody starts a farming operation across the street from what has been an abandoned home site on a farm, is that still the same usage? Well, we use the term abandoned property. I'm using it much like abandoned. Here nobody's living in the house for a period of years, but here it's 50 or 100 years. Does someone who wants to start a cattle operation have to research to see if there was ever a farm site on that property or a home site on that farmland across the street before he or she can start a cattle operation? I don't think if I moved a cattle operation across the road from vacant land that I would have to research all the property around to see if ever there was a house. But in this situation, there was a house. There was someone living there when they made the decision to buy across the street. But they didn't start the operation until it was vacant. They didn't start the cattle operation, correct. Okay. So if I wanted to start a cattle operation across the street from what is obviously a vacant and abandoned old farmhouse, could I do that? Well, you can do it, but it doesn't mean that you can use this statute to stop a nuisance action. So if somebody tears that house down 50 years later or within a year and builds a house, I'm subject to this? If there's already a house there, it was already occupied, as the facts in this case are. No, not occupied. Not occupied. Not occupied when I started the farm operation. It's just totally vacant. It's sitting there. Right. Mr. Roth, I'm not from the farm country, but I just had a question. You mentioned that Bobbie still has horses on the property. Yes. And had horses when the tenant was there. She had horses since 1989, boarded at the barn right behind the house. Was that a nuisance to the tenant with the flies with the horses? No. No complaints ever. And according to your argument and the way you would define this, it wouldn't make any difference whether that house that was unoccupied was in pristine condition or terrible condition. Right. Because it's a house. It was intended as a house. It was used as a house. It was to be used as a house. It was to be used as a family location. My clients take very not-so-friendly the concept that they're not farmers, because Roger Toftoy has been farming with his dad since 1967 from that location. The equipment is on that location. The farmstead is there. It is the family farmstead. The transfers by gift, both of the parcel for the house and also for the surrounding 58 acres that was given to them subsequent, the language in the deed that I attached to my brief that's got all this language that if they ever wanted to sell it, they've got to give it back to Clarence. This is their family farm. They are farmers. This is a farmhouse in the neighborhood. I don't think you could interview farmers and say, oh, that's a non-conforming, non-agricultural use because it's located there. Mr. Roth, your time has expired, but Justice Thomas has a question. We get to go over, but you don't. I started out with a question for opposing counsel as to the statute itself, which we haven't spent a heck of a lot of time talking about. And the broad versus narrow, right? Wouldn't we have to accept your position, and again it gets back to the definition, of any change condition? We would really have to just say condition equals use. Because otherwise, everything we've talked about would indicate occupancy is obviously a condition of some sort, but for purposes of the statute, wouldn't we have to look at it as any changed use? I think in not being able to verbalize something other than use as to describe a change condition, I would have to agree with you. And wouldn't that make this court lean towards looking to a broad interpretation, knowing that the legislature knows the word use was out there? Well, they also knew the word occupancy was out there, and they also tied this to the word because. And if we go into the infinite extrapolation of this, we could say that they said, well, you can never have a nuisance unless someone's there argument, which is occupancy, saying if no one's there, then there's no nuisance kind of issue. So where does it make any sense? The sense is that something that is done by the owner or occupant of the property, in conjunction with what the farmer has been doing, now means we have a nuisance. I don't think the legislature was saying, well, we need to point out that if somebody is not occupying their land, they can't bring a nuisance action. And if they all of a sudden decide to occupy their land, that is a changed condition. Because I think it's presumed by the legislature that someone has to be there in order for there to be a claim of nuisance. And the question is, what has that person who is there done to change the conditions such that before there was no nuisance and now there is? I think it was the legislature's intention. I think you've answered his question. Okay. Thank you very much. Thank you. Rebuttal, if any. Thank you again. I would just note that the first sentence of Section 1 of the Farm Nuisance Suit Act provides as follows. It's a declared policy of the state to conserve and protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products. If you accept the narrow interpretation and the definition as proposed by the Toftoys over changed conditions, then what happens is the farming industry is locked down by whatever use was done on a specific piece of property for more than two centuries. And so what we'll have as a situation is exactly some of the hypotheticals were suggested here, is that we'll have someone come to the court and say there was a house here in 1850. And because there was a house here in 1850 and I built a new house, you can't make those improvements on your property because you're going to have to think about that issue. And you're going to have to think about whether or not a nuisance action was going to be filed against you. And that's exactly contrary to the language of the statute. The statute uses use and any. And under the circumstances that are presented to this court in the facts of this case and the interpretation of the statute itself, that's a broad set of circumstances that covers any condition. And under those circumstances, there is no basis and there's no statutory basis for the court to read into that statute any limiting provisions in the sense of residency, occupancy, any other circumstances. It says any condition. And that's because to facilitate and to bring the purpose of the statute to encourage the development of farmland, that's the way you have to read it. You have to read it from the beginning of the development of the operation moving forward. And under those circumstances, that's what needs to be looked at. We can't do a historical analysis because that leads to a situation where farmers start thinking about other things than moving forward and developing their property. And if we don't consider all of the conditions, then that leaves a gap open and there's no statutory basis to do so. And with that, I think I'll step back. Thank you. Mr. McKnight, Mr. Roth, we thank you for your arguments today. Case number 113569, Roger Toftoy et al. Appellees versus Ken Rosenwinkel et al. Appellants as taken under advisement is agenda number 18.